Good morning. May it please the Court, Jody Thorpe on behalf of Mr. Vasallo-Martinez. The District Court erred when it asserted the role of the immigration judge and found Mr. Vasallo was not prejudiced by the violation of his due process rights. The sole issue before this Court is whether the Court erred when it found that Mr. Vasallo was not prejudiced. What's the standard of review we use on that issue? De novo review. The District Court judge's finding was based on the fact that Mr. Vasallo-Martinez has a prior criminal history, specifically DUI convictions, driving under the influence convictions. So what Mr. Vasallo-Martinez had to show was he had to make a prima facie showing that he was eligible for relief, that he was prejudiced based on a plausible case. A plausible case. First he must basically just show the showing of prejudice. When looking at plausibility, basically he has to do two things. First, eligibility, which he's eligible for and the government concedes he's eligible for. And second, plausibility. And plausibility is basically a superficial assessment of whether he had plausible grounds for relief in front of an immigration judge. He did have plausible grounds for relief. When you look at the Board of Immigration Appeals cases, you're not going to find a lot of cases because when people are granted voluntary departure, they don't appeal those decisions. However — But this was a pre-hearing voluntary departure issue. The question is whether there was a plausible basis for granting him pre-hearing voluntary departure. Correct. And the only requirements for pre-conclusion or pre-hearing voluntary departure are that he not have any terrorist-related activities and that he not have an aggravated felony. And he did not have an aggravated felony. He did not. And the parties agreed. And what were the countervailing equities? On the one hand, he had four DUI convictions. What were the countervailing equities in this case? He was brought to the United States when he was about eight or nine years old. He had resided here under the Family Unity Program for a long time. He spent about 20 years in the United States prior to his request for voluntary departure. He graduated from high school here. His mother is a legal permanent resident. His wife is a United States citizen. His daughter, three-and-a-half-year-old daughter, is a United States citizen. And his sister, who he's had the closest relationship to throughout his life, is also now a United States citizen. What's his relationship with his daughter? What do we know about that? He's a father to his daughter. He's still married to the mother. What do we know? I mean, there are lots of fathers and daughters. I mean, is he separated? Are they together? Does he take her to church, to school? I mean, is there any connection that we know of from this record? There's a connection. He's still married to the mother. That doesn't mean anything nowadays. I mean, that's all we have, though. It's just superficial. He's married. He has a daughter. And superficial is all you need. The plausibility showing is a superficial showing. Well, how old is your client? When was he born? He's in his 30s. I think he's about 36. I don't know. He came here when he was how old? Eight years old. And he's lived here for 21 years, so he's about 30. Yeah, approximately. In his 30s. Well, he was eight when he came, and he's been here for 21 years. His case was pending for about two years before the district court. So, yeah, he's in his early 30s. Well, you know what his record is, and I don't want to beat a horse here, but in 1998 he started acquiring driving under the influence convictions, punctuated by sex with a minor by younger than three years, disorderly conduct, driving under the influence, driving without a license, driving under the influence, which finally ended him up with 16 months in prison. And then the probation officer says, this is defendant's fourth driving under the influence, but he apparently continues to drive and to do so under the influence. The defendant certainly poses a threat to the community due to his continued drinking and driving. He's had the privilege of probation supervision in the past, but obviously failed to reap the benefits. It appears the defendant has involved himself in several drinking driver programs, but has continued to drink. Although the defendant may be eligible for probation, it is obvious to this officer that despite any harsh sanctions, if released within the community, the defendant will only continue to drive and most likely under the influence. So none of the programs have worked. He applied for voluntary departure once before in 2002, and that was denied. Well, a couple things. So how, I mean, this strikes me as implausible at best that he's going to get voluntary departure. Who's going to put this guy on the road? And I know this is voluntary departure, and I understand the whole thing, but this is a very serious record. Two things. The probation officer was making an assessment as to whether he should do time in custody, not whether he should be permitted voluntary departure. What's important to remember is that the pre-conclusion voluntary departure is not a request to remain within the United States. I understand that. It's a request to depart voluntarily. He's going to leave the country either way. That's why there's not a chance. What are the implications? What happens to you when you get voluntary departure compared to the alternative? There's a bar. You're asked to, right, you're not considered deported. And that's really what's the issue here. It's the bar underneath it all. Well, yes, and the fact that you're not considered deported. I think it's important that the court know that the family unity voluntary departure that Mr. Masayo-Martinez was denied in 2002, he had been granted that voluntary departure in the past. The family unity is a two-year ability to remain in the United States, not a departure. And he was denied that based on procedural grounds. He had not completed all of the paperwork. So the fact that he had been denied that voluntary departure shouldn't have any assessment. Whose fault is that? That's his fault, but it shouldn't preclude pre-conclusion voluntary departure. But what is there other than abstractions, such as he has children and is married and all that kind of stuff, that counts in his favor as compared against all the other things that don't? The Board of Immigration Appeals cases count in his favor. Yeah, those other cases are fine, but these are very fact-specific. They are fact-specific. Do you have another case where somebody has four DUIs like this, driving without a license? I mean, it's clear to me the guy's a scofflaw. But when you look at Pineda-Castillo. Both. Okay. So maybe you can clarify this for me, because it seems to me he would not be – it's not plausible he would get a post-hearing voluntary departure, because I think all of this other activity would result in the finding that he doesn't have good moral character. That's correct, Your Honor. But this pre-conclusion voluntary departure apparently only requires that he's not an aggravated felon and that he's not involved in any terrorist activity under the statute. And that seems like a really low standard. Almost anybody could get that. It is a low standard, and that's why – it's because you're leaving the country and not asking to remain in the country. Other forms of relief, you're asking to remain in the country. Under that, does he have a waiting period before he could ever come back? He would still – he would still have to reply to return into the – to come back into the United States. He came back three days after he got thrown out the last time. Well – He violated – he violated every probation he was ever on and the parole and everything else. To come back legally, he would have to apply. But didn't he come back three days after he was removed before? He did, Your Honor. And that was in violation of everything under the sun, including parole. There's no question that he has violated the law. The question is whether he's doing that – Continuously. Continuously. Nonstop. But this is – this is an immigration judge's decision to make. It wasn't the district court's decision to make. It's not this court's decision to make. Well, he's got to have a plausible – It's the immigration judge. No, he's got to have a plausible case. He's got to convince somebody that he has a plausible case on the merits, on the facts. Right. An immigration judge. And in Pineda-Castano's, an immigration judge was convinced, despite the fact that the person had six criminal convictions – one for illegal entry, two for battery, one for drunkenness, one for threatening, and a DUI. So when you look at the fact that an immigration judge granted that person pre-conclusion voluntary departure and the BIA affirmed it, we can't say that an immigration judge would not have granted Mr. Basayo-Martinez pre-conclusion voluntary departure. Now, why isn't he eligible for an adjustment of status, and why hasn't he applied for that in the past? Well, Your Honor, he was here on family unity, so he – But he married a U.S. citizen wife as a U.S. citizen kid. He could have applied for adjustment of status, and he still can apply for adjustment of status in the future. Is there any indication why he didn't? No, Your Honor. I see that my time is up. If there are no further questions – Thank you. Good morning. Kyle Hoffman for the United States. I'd like to take up on a point that Judge Woodlaw made during the commentary with counsel, and that's the question of the standard for pre-conclusion voluntary departure. Admittedly, the statutory eligibility standard is low. No terrorist activities, no aggravated felonies. Now, did he have any – he had felonies, but no aggravated felonies? No, that's correct, and there's no argument about that. Okay. But that's not the end of the story. The story continues to would or could this defendant have made a plausible claim for relief? That is, could he have shown facts to the Attorney General that would have caused the Attorney General to exercise discretion in his favor? This form of relief, and this is the Arguellas case that we've cited, is always not just about the statute, but also always about discretion. And there you have to get into the balancing of the equities that, again, Judge Woodlaw and Judge Trott both got into. So what I'm saying is, on the one hand, statutorily, it's a low bar. But on the other hand, you always need to make a show on the equities, on the discretionary aspect. Yeah, on the other hand, discretion is awfully wide. It's wide. And given some of the – especially the case that counsel just cited, doesn't that indicate that it's a possibility? Well, I'd say two things about that. First of all, I don't think the standard is a bare possibility. That would almost collapse into, is he eligible at all? I would suggest that it's always a question of weighing the equities back and forth. And the one thing I would point out, again, in response to Judge Woodlaw's question to counsel, was the equities that were presented to the district court in this case were barest of bare bones. And I think Judge Trott was mentioning this as well. It was wife, U.S. citizen wife, child, nothing else. Do they still live together? Do they still – are they raising a child together? You know what they said? The motion talks about how they've been married for six years. They're together. The child's the joy of his life. The reason he reentered after having been deported was that they were sad, and the family was sad and missed him. He was sad and missed them, so he came back. Well, I – I don't recall seeing that, Your Honor. Maybe I – Okay. Take a look at Defendant's Response to Government Sentencing Documents and Defendant's Sentencing Memorandum. It's in there.     and weighing the equities back and forth, and weighing the equities back and forth. And even the pre-sense report points out that his terrible problems with drinking and this repeated DUI situation stem from his horrible childhood and upbringing. And that's in the PSR. Right, Your Honor. I don't know. I'm just throwing out – I mean, the problem for me is really what's plausible? You know, plausible. What does that – put me on it. And does it just depend on the I.J. you get that day? And, you know. Your Honor, if I could, I would suggest that plausibility is what – that's the Arcelor-Hernandez case. It's plausible showing that the I.J. would have exercised discretion in his favor. It depends on who the I.J. is, doesn't it? Well, I mean, I think – I've seen the statistics and the variations among I.J.s on the same kinds of issues. It's like getting a panel on the main circuit. Exactly right. Exactly right. Flip a coin. Well, what do you do with this Alonzo Gonzalez-Figueroa case, for example? It seems to show us how wide this discretionary possibility is. Four convictions for assault, 1997, 1999, 2002. Six months in prison for the last conviction. Resisting arrest in 2000. Numerous arrests from 1995 to 2002. Drinking all over the place. And they said here, nonetheless, this was an appropriate exercise of discretion by the I.J. Right. Well, I don't think we know from that the countervailing equities that were before the I.J. We don't. But we sure know all the garbage against it. Correct. And they say the garbage notwithstanding, there are some equities. Right. And so – I agree. I mean, the case says what Your Honor has suggested it says. The problem is, I think there was a phrase, these are always a very fact-specific inquiry. Right. And here, the facts, we have the DUIs with 16 months of custody. Meaning, at the last time, somebody took this very, very seriously. As I recall, it blew over two times the legal limit, driving around the streets of Los Angeles. Well, and he was driving without a license, too. So that's part of the problem. So, in other words, and the district judge, in this case, took a look at that which is a very serious offense and said, I don't see the equities. I see these as being very detrimental to your case, and I don't see the equities on the other side. And I would submit that that was an error here. That he made the call that you had not made a plausible showing that you would have gotten this relief. If he's allowed to deport voluntarily under these circumstances, how does he get back in the country legally? Well, he would have to either adjust status or he would have to do something to return legally. He would not face the 10-year bar. But when you say do something, would he have to get the consent of the attorney general to come back? It would depend on what the statute would be that he would. I think he would have to adjust status, and I think that it does require the consent of the attorney general. But I'm not absolutely 100 percent sure of that. I do know this, though. It's a little misleading to say, well, there's no consideration about whether he would be a desirable permanent resident or whether he would stay here. First of all, voluntary departure, he would have to go on his own. A lot of times they have to go on their own back into their country of origin. There can be conditions put on it. But always it's looked for with an eye to, well, is this person in the long term a good candidate for permanent resident in the United States? That's what the Arguelles case says. And so here, I would suggest... Well, if he cured his drinking problem, for instance. He was here, what, 17 years, and he worked steadily that whole time? He's still in the panic. Well, and he's got a family here. I mean, if he didn't have a drinking problem, he probably would be a good candidate for residing in the United States. Your Honor, so I saw the record. It was, I think, self-admitted 12 beers a day. And we know that when people talk about their alcohol consumption, they usually under-report it. He's blown twice the legal limit the last time driving around the streets. And people take DUIs much more seriously than they used to in the past because, as it says all throughout the BIA cases, it puts the general public at risk. Judge Trott, what judge let this person out on the street? He mowed somebody down in the streets of Pasadena. Bill O'Reilly would be on you in a second. So I would suggest that's a very significant equity against the defense. I agree with you. I think DUIs are very, very serious. But, you know, just even meeting the PSR, I get a lot of sympathy for this guy and see how he ended up with this problem. And I don't know why another I.J. might not look, I mean, a fair, objective I.J. looking at all these facts might not say, well, give him a chance. Your Honor, I'm not trying to downplay or say that the defendant doesn't merit sympathy for certain aspects of his life. It's clear that does. I'm not sure that those are part of the discretionary factors that the I.J. is supposed to look at, which are, does he have close family ties in the United States? Well, the answer to that is yes. I'm sorry? The answer to that is yes, he has close family ties. Well, he has a – there's a declaration that says he has a wife and a daughter. So I think we're – What I was looking for was something under that, as you could tell. I mean, is there something from the daughter, something from the wife? I couldn't find – is there anything like that? I couldn't find it. I didn't find it. And it wasn't – as far as I could tell, it was not put in front of the district court. But – Well, what he says to the PS – the probation officer, he relayed that he has a good marriage, but that his wife and daughter are sad without him. I would suggest that – I mean, if you look at the Arrieta case, which is where there was – I think it was Judge Reinhardt's case where it was because there was something more. There was all kinds of – I went to PTA with my daughter, and I was intimately involved with education and so on. I suggest that that's not here. That guy's a little young for the PTA, isn't he? Yes, and actually, he's not – she wouldn't be his school age. The daughter wouldn't be his school age at this point. Well, I was still trying to find out, really, what happens. Judge Pratt says, well, he can come back immediately. But that happens, I know, with however the person leaves. They come back. Right. The bar is what people are generally concerned about under these circumstances. Correct, because it would – it just – I mean, even the bar would not necessarily permanently preclude someone, but it would for a certain period of time. He's back in three days anyway. Now, how does voluntary departure work? Do they just shove you out the door and say, voluntarily depart? It can – I tried to do a little research on that, and as I understand it, it can work in a variety of ways. It can be that way. It can – there can be conditions, bond, and it can be sometimes even the DHS will just ship them over. It works in a variety of ways. So I wouldn't want to be quoted as saying it would necessarily result in – In out the door. Right. Yeah. But that is one possibility, and actually, that's the way it usually is. If his ties are that close to his family, though, he probably would just come back anyway. We'll leave that for the future. If there are any further questions, I'd be happy to try to answer them. Now, is he serving time in jail right now? As I understand it, he's due to be released probably next week sometime in December in the teens, as I recall correctly. I think this briefing might have been on an expedited schedule as well. Thank you. Thank you. Thank you. Yes, a minute. With respect to some of the court's questions, Mr. Vassallo is scheduled to be released on December 10th. However, he will have a two-year term of supervised release that affects him as well. With respect to the Arietta case and Your Honor's concern about why isn't there or would we need more equities, in the Arietta case, that was a 212H case where you have unusual hardship as a requirement. So you have to put out more showing that there's unusual hardship to the family. That is not necessary in this case. Did you represent him in the district court? I did, Your Honor. Is there any reason why there isn't a record full of close ties and stuff about the wife and the daughter? I mean, it would seem to me that that's the first thing you'd try to do is show this relationship is real other than just that it exists. Well, Your Honor, the relationship that they have, he commented that he's close. You're an officer of the court. What do you know about the relationship with his daughter? That they're close. He's close to his family. It was very hard for him when he was deported. Have you met the daughter and the wife? I've met his wife. I have not met his daughter. And I talked to his wife. She just called me last week asking me what was happening with this case. His family is very concerned about him, and they are a close-knit family. And he told the probation officer that as well. So he's released on December 10th. Yes. Is he going to be deported then? He will be put back into INS custody. We don't know what will happen. They could try to rely on this prior deportation. He could possibly be given a voluntary departure then. I mean, he'll go into the immigration custody and then make the determination as to what to do with him. And if we decide that the motion to dismiss the indictment should have been granted, then what? He will have already served his time on this case. He will have already served his time, but he will not have supervised release. So there's that benefit. The other benefit is then he's not considered ever having been deported. He doesn't have any prior deportations. This was his only deportation. So if he were to try to adjust status, he wouldn't have any prior deportations. And you would probably advise him at this point to try to adjust status? I would advise him to adjust status and to get treatment. I think those are the two things I would advise for him. And I think he could be successful. When you look at plausible, the dictionary for plausible says superficially fair. I think here, when you superficially look at this case, it's fair for him to have an immigration judge determine whether he is allowed to voluntarily depart, not the district court judge. That's not the role of the district court judge. I don't know. Sometimes we bear off with the district court judge. Sometimes with the immigration judge. This case, we weren't. The other thing that I just wanted to clarify is the — Were you a public defender? I was, Your Honor. Now I'm on the CJA panel, and I represent him. I've represented him through while I was at Federal Defenders and now. I see. When talking about — You have one more sentence. Okay. Talking about whether they consider good moral character for pre-conclusion voluntary departure, that's not considered. And there's not a look to the future, because somebody who could not adjust status also has the ability to depart for pre-conclusion voluntary departure. So it really is just should this person be allowed to depart. And typically they give about 120 days to depart. Thank you. Thank you, counsel. Thank you both very much. Next case for argument is United States v. Ramos.
judges: Reinhardt, Trott, Wardlaw